*556 OPINION OF THE COURT
Daniel Turbow, J.
This matter is on for decision following an evidentiary hearing conducted upon the application of the Children’s Aid Society (the petitioner or the agency) to find respondents in violation of the terms of suspended judgments entered against each in proceedings to terminate their parental rights. In addition, the court has before it the respondent father’s motion to dismiss the proceeding against him. Citing the recent decision in Matter of Jonathan B. (193 Misc 2d 52 [Fam Ct, Queens County 2002]), he contends that the period of the suspended judgment entered in his case expired before the agency brought on the instant application and that, as a result, the terms of the suspended judgment are no longer enforceable.
For the reasons to be discussed below, the court finds that the petitioner has sustained its burden of demonstrating by a preponderance of the evidence that, as a matter of fact, respondents did indeed fail to comply with their obligations as set out in the suspended judgments. In addition, we conclude that on these facts Jonathan B. is distinguishable and that the father’s suspended judgment remains viable and enforceable. Accordingly, in accordance with the procedures contemplated by the suspended judgments upon a finding of a violation, the matter will be set down for a dispositional hearing.
A. Background
The two children at issue are T.R., who was born on January 22, 1995, and D.R., who was bom on February 27, 1997. The respondent M.R. is the mother of both children and the respondent D.R.M. is the father of D.R. The children have been in the care of the agency since May 1997, as a result of proceedings which resulted in a finding of neglect entered against the mother under Docket No. Nl1306-8/97 (Fam Ct, Kings County).
i. The Suspended Judgments
On or about February 9, 2000, the petitioner commenced the instant termination proceedings against the respondents pursuant to section 384-b of the Social Services Law. The petitions charged the mother with having permanently neglected both the subject children and charged the father with having abandoned and permanently neglected his child D.R. On July 5, 2000, before Judge Ralph Porzio, the respondent mother, represented by counsel, made an admission to the permanent neglect charge and, on consent, the entry of a suspended judgment was directed.
*557 The formal order imposing the suspended judgment, which was signed by Judge Porzio on October 23, 2000, directed that judgment was to be suspended for the period of one year from the date of the mother’s admission, i.e., from July 5, 2000 to July 5, 2001. The judgment’s suspension was expressly made subject to certain terms and conditions, including the mother’s obligation to visit the children regularly and attend planning conferences at the agency. In addition, the mother was “to comply with all Agency referrals,” “to stay in and complete counseling,” and “to accept post placement services (including preventive services).” As required by Uniform Rules of Family Court (22 NYCRR) § 205.50 (b), the order also clearly alerted the mother to the possible consequences of her failure to comply with her obligations. Thus, on its first page, it stated in bold type: “warning: failure of respondent mother, m.r. to obey the TERMS AND CONDITIONS OF THIS ORDER MAY LEAD TO ITS REVOCATION AND TO THE ISSUANCE OF AN ORDER FOR THE COMMITMENT OF THE guardianship and custody of the child.” And, the final paragraph of the order, also in bold type, set forth the following: “Failure by the respondent mother, M.R. to obey the terms of this order may lead to its revocation and to the issuance of an order for the guardianship and custody of the child after a dispositional hearing.”
On September 6, 2000, before the Honorable Susan K. Knipps, the respondent father, represented by counsel, admitted that he had abandoned his child and also consented to the entry of a suspended judgment. The formal order was subsequently signed by Judge Knipps on November 21, 2000. It suspended the judgment for a period coextensive with the period applicable to the mother, i.e., from July 5, 2000 to July 5, 2001, upon certain prescribed “terms and conditions.” Among these was a requirement that he “visit regularly (every two weeks),” and that he “keep the Agency apprized [sic] of his whereabouts.”
The order also contained the following provision whose operation not only affected the father’s substantive obligations but, as will be discussed below, directly impacted upon the father’s contention that the terms of the suspended judgment are no longer viable:
“In the event the mother, M.R., does not comply with the terms of the suspended judgment entered herein against her with respect to this child and he is served with notice of her failure to comply with *558 said suspended judgment, then the father has 30 days to come up with [a] plan to remove the child from foster care.”
The transcript of the proceedings before Judge Knipps explains the reason for that provision. All parties understood that at that time the agency was planning to have the child returned to his mother. However, if the mother failed to comply with the terms of her suspended judgment, and was unable to assume care of D.R., the father would have the opportunity to put forward his own plan:
“judge knipps: The current plan is that they’re working with the mother to discharge the child to her care * * *
“She has a number of conditions she needs to satisfy before that can occur. If she fails to comply with those conditions, so that the child can’t be returned to here [sic] care, the agency is going to notify you. At that point, you’ll have 30 days to come up with a plan to keep the child out of foster care. Do you understand those conditions?
“d.r.m.: Yes, I understand.” (Transcript, Sept. 6, 2000, at 11.)
The signed order also contained the identical warnings regarding the consequence of the father’s failure to comply with its terms as had been contained in the order affecting the mother.
ii. The Violation Petitions
Given the nature of the father’s assertion concerning the timeliness of petitioner’s application, it is necessary to review in detail the precise procedures followed in bringing on the instant proceedings.
On July 5, 2001, the day upon which the suspended judgment involving the mother expired, the petitioner submitted an order to show cause seeking an order that the mother had willfully violated the terms of the suspended judgment. The submitted order further directed that “pending the hearing and determination of the matter, the suspended judgment herein be and it hereby is extended.” Judge Knipps signed the order to show cause and made the application returnable on August 27, 2001.
An affidavit of personal service submitted by the agency established that the father was served with the order to show cause on July 23, 2001. The father has denied receiving the order to show cause at that time. Nonetheless, on August 27, the *559 parties, including the father and his counsel, appeared before Judge Knipps. Judge Knipps noted on the court file that no order to show cause had been filed as against the father, but that the father “now has notice of [the] motion to revoke [the mother’s].” She noted further that the father had proposed a “resource” to assume the care of the child outside of foster care — a paternal aunt. As per Judge Knipps, that aunt was to file for custody of D.R. within 30 days.
On September 10, 2001, Judge Knipps signed an order to show cause submitted by the petitioner to bring on the instant violation petition against the father. The supporting papers alleged that the father had failed to visit regularly with the child, had failed to inform the agency of his address, and had otherwise failed to plan for the child’s return. In addition, petitioner asserted that the father had not put forth a viable plan for the child’s removal from foster care within 30 days of receiving notice of the mother’s failure to comply with her obligations. In this regard the petitioner alleged that the father had failed to reasonably advance himself as a resource for the child since he had failed to undergo random drug tests, participate in a psychiatric evaluation, complete a parenting skills class or provide proof of income. In addition, it was alleged that the paternal aunt the father had advanced as a resource for the child was not a viable caretaker.[1] As did the order to show cause filed upon the mother’s case, this one also provided that “pending the hearing and determination of [the] matter, the suspended judgment herein be and it hereby is extended.”
A hearing on the alleged violations commenced before Judge Knipps on December 11, 2001. However, upon her transfer from Kings County to New York County in February 2002, Judge Knipps declared a mistrial and the hearing subsequently recommenced before the undersigned. On or about November 5, 2002, as the hearing neared conclusion, the father moved to dismiss the petition as untimely on the authority of Matter of Jonathan B. (supra). The court reserved decision on the motion and concluded the hearing. It thereafter received additional written arguments.[2]
B. The Facts Adduced at the Evidentiary Hearing
*560 In order to prevail, the petitioner must demonstrate that the respondents violated the terms of the suspended judgments by a preponderance of the evidence. (Matter of Desiree W., 232 AD2d 227 [1st Dept 1996].) After considering the evidence presented at the hearing, the court finds that the agency has satisfied that burden.
i. The Mother
With respect to the respondent mother, the petitioner’s case is straightforward and overwhelming. Ms. Cathie Busch, a caseworker employed by the petitioner who had been supervising the case since 1999, testified credibly that the mother attended only 9 of the 52 weekly visits with the children that had been scheduled during the original term of the suspended judgment, i.e., from July 5, 2000 through July 5, 2001.[3] In addition, she testified that the mother failed to attend a service planning conference that had been scheduled for September 9, 2000. Furthermore, petitioner submitted documentary evidence establishing that the mother was notified in writing both of the visitation schedule and the planning conference.[4]
The mother testified on her own behalf. Her testimony was self-serving, inconsistent, imprecise, and entirely lacking in persuasiveness. In essence, she testified that she attended approximately 30 to 36 of the 52 scheduled visits, and presented a host of excuses for entirely missing, or arriving late to, others. Among her excuses were scheduling conflicts caused by her obligations to care for other children, a lack of funds to travel to the visits, a loss of her keys, an unspecified illness of her mother, and the receipt of a notice from the ASPCA concerning her dog. With respect to her absence at the planning conference, the mother stated she simply did not receive the notice mailed by the agency, offering the excuse that her mailbox was broken.
The court rejects this testimony. Her assertion that she attended approximately 30 to 36 visits is simply not credible. Also lacking in credibility are the mother’s proffered excuses *561 for her failures. Indeed, the record makes clear that petitioner strived to facilitate visits and the mother simply did not take advantage of the agency’s efforts. Thus, the agency specifically changed the visitation schedule to accommodate the mother’s other child care responsibilities, and paid for a car service to take the mother to and from the visits.[5] Similarly, we reject the mother’s claim that she did not receive notice of the service planning conference scheduled for September 9, 2000.
In sum, we find that the mother failed to comply with those terms of the suspended judgment entered in her case which required her to visit regularly with the children and attend service planning conferences.[6]
ii. The Father
The petitioner primarily alleges that the father failed to comply with two of his obligations under the suspended judgment in his case. First, it asserts that he failed to visit his child D.R. with the regularity required. Second, it claims that once the father was notified of the mother’s failure to comply with the terms of her suspended judgment, he failed to present a plan to remove the child from foster care. The evidence presented against the respondent father is not as weighty or unambiguous as that presented against the mother. Nonetheless, the court believes that it is sufficient to warrant a finding that the terms of the suspended judgment were violated in both these respects.
With regard to the visits, the issue is complicated by the fact that during approximately the second six months of the period *562 of the suspended judgment, i.e., between January 22, 2001 and July 5, 2001, very few, if any, visits were scheduled by the agency for the father. The reason was that at a visit of January 22, the father and the agency caseworker at the time, Mr. Chris Boylan, apparently got into some type of confrontation that upset the child. Although Ms. Busch testified that there were some additional visits thereafter scheduled on February 2, February 16 and March 16, the father credibly testified that during that period he asked for visits, but was told by the agency that none would be held because the child did not want to see him.
The father’s version of the events of this time are supported by the fact that on March 29, 2001, the child “reported to [his] therapist that he was terrified of his father and he was refusing to have any contact.” (Transcript, Sept. 9, 2002, at 29; see also transcript, Sept. 17, 2002, at 53.) Furthermore, the petitioner’s case record reflected that visitation had “stopped because D.R. had requested not to see his father due to D.R. witnessing an incident at the agency in which the birth father and the previous worker had a disagreement.” (Id. at 54.) Indeed, it appears as if the next visit was not conducted until August 8, 2001, when the agency arranged a “reunification visit” which, unfortunately, did not go well.[7]
Obviously, the father cannot be held responsible for failing to visit during a period when no visits were allowed. However, he also missed some visits which had in fact been scheduled during the earlier portion of the period covered by the suspended judgment, i.e., from July 5, 2000 until January 22, 2001. That failure constitutes a violation of the terms of the suspended judgment.
There is much contentiousness about what, precisely, transpired during that period. Ms. Busch testified that even though the suspended judgment contemplated biweekly visits, the father “would not commit to a bi-weekly visiting schedule,” because of alleged conflicts with his work schedule. (Transcript, July 9, 2002, at 30.) Furthermore, although she asked him to provide documentation about his hours and employment so as to try to arrange visits “outside the normal business schedule,” he refused. (Id. at 31.)
*563 By contrast, the father testified that he sought to arrange visitation and that the agency refused to cooperate or cancelled visits. In support of that contention he presented documentary evidence in the form of a letter dated October 7, 2000 by his counsel to the petitioner, reciting the father’s efforts to obtain visitation and the agency’s nonresponsiveness.
The court need not resolve these conflicts with respect to the entire period at issue. Suffice it to say the evidence clearly establishes that the father missed at least those three visits scheduled for November 3, 2000, November 17, 2000 and December 1, 2000. On each of those occasions the foster mother had appeared at the agency with the child. And, on each of those occasions, the father had notice of the scheduled visit.[8]
Thus, referring to the case records, Ms. Busch testified that
“On 11/3 Social Worker received a phone call from D.R.M. D.R.M. stated he would not be able to make the scheduled family visit at the agency at 4:00 PM due to work obligations. Social worker informed birth father the next scheduled visit would be for 11/17/00.
“11/17/00 birth father did not show up nor did he call to cancel the 4:00 PM visit.
“12/1/00, family visit scheduled for 4:00 PM with the birth father. Birth father did not called [st'c] nor did he show up to cancel.” (Transcript, Sept. 17, 2002, at 60-61.)
Although the father acknowledges missing one visit for work-related reasons, he denies missing the others. However, his testimony in this regard is exceptionally vague and imprecise. When tested against the petitioner’s evidence his denials cannot be sustained.
We acknowledge that in another context missing a few visits might be viewed as insufficiently material to warrant a finding of a violation. However, in this case, where the visits were essential to foster a bond between the father and child following *564 an admission of abandonment, and where the father had expressly agreed to regular biweekly visits with the understanding that his failure to honor that commitment could lead to the termination of his parental rights, strict compliance with the terms of the suspended judgment is plainly appropriate. (See, e.g., Matter of Israel R., 200 AD2d 498 [1st Dept 1994]; see also Matter of Jennifer W., 241 AD2d 622 [3d Dept 1997].)
The facts surrounding the father’s alleged failure to come forth with a plan to remove D.R. from foster care are likewise hotly contested and, once again, the father’s contentions are not entirely without surface plausibility. However, once again, the agency has proved that the father did not comply with his obligations under the terms of the suspended judgment.
The father presented evidence that, during the period of the suspended judgment and following the mother’s default, he sought to position himself as a resource to assume care for the child but that the agency failed to work with him toward that end. Among other things he asserts that the agency never took him seriously as a potential caretaker for the child and imposed unreasonable and unwarranted obligations upon him, such as requiring that he undergo a psychiatric evaluation and undergo screening for drug use. He points out that he was not a respondent in the original Family Court Act article 10 proceedings which caused his child to be placed in foster care and argues that the agency had no lawful basis to impose such burdensome requirements.
By contrast, the petitioner contends that it was reasonable for the father to undergo a mental health examination and drug screening before discharging the child to his care since he allegedly demonstrated “explosive” behavior and “poor impulse control” when dealing with the agency which raised concerns about his fitness to care for his young son. (See transcript, Sept. 9, 2002, at 38-40.) Accordingly, because he refused to participate in the evaluation and testing processes it cannot be said that he in fact was a viable resource for the child once the mother failed to comply with the terms of the suspended judgment.
The evidence does suggest that the agency did not at all times genuinely work toward a goal of discharging the child to the father and, quite frankly, there was some fieldwork *565 which was not textbook perfect.[9] However, the obvious reason for the lack of focus upon the father was that all concerned— including the father — had expected the child to be returned to the mother. (See petitioner’s exhibit 4.) Yet, to the extent that the agency could be said to have considered the father a possible “backup” resource, the court believes that it was reasonable under the circumstances for the agency to require a psychiatric evaluation and random drug tests. After all, even if a parent’s wrongful conduct is not the reason the child has been placed in foster care, once the child is in foster care it is incumbent upon the responsible agency to assure that the parent is capable of caring for the child and that a discharge to the parent is in the child’s best interests. (See generally Matter of Michael B., 80 NY2d 299 [1992].) Moreover, while the father was not an initial respondent in the underlying proceedings under article 10, he did admit to having abandoned the child in the termination proceeding. In that context, and given the evidence presented regarding the father’s hostile behavior toward agency workers and the mother, it cannot be said that the agency’s concerns here were irrational. (Cf. Matter of Frances Aisha S., 238 AD2d 512, 513 [2d Dept 1997] [ordering “ ‘best interests’ hearing (to) be conducted to determine whether immediate discharge of (the child) to her natural father is appropriate in light of the facts and the allegations made by the caseworker against the father,” even though placement had lapsed and termination proceeding against father had been dismissed]; Matter of Crystal H., 135 Misc 2d 265 [Fam Ct, NY County 1987, Schechter, J.] [court has authority under Family Court Act § 251 to order psychiatric examination of nonrespondent parent in proceeding under article 10].)
However, even if these requests of the agency were unreasonable or unauthorized, the father failed to take the most essential steps necessary to serve as a resource for the child after he learned that the mother had failed to comply with her obligations. Thus, in early August 2001, reiterating the substance of a letter sent the father on February 27, 2001, Ms. Busch told him that, in addition to the random drug screening and psychiatric evaluation, he needed to provide proof of an ability to support the child and obtain a clearance from the State Central Registry of Child Abuse and Neglect of the other members of his household. Ms. Busch testified credibly that he failed to provide the agency with the name of his employer and *566 he acknowledged that he did not provide her with the necessary information concerning his housemates. Even respondent has not suggested that the agency acted improperly in seeking this information. These failures alone thus served to preclude him from being seriously considered as a resource for the child.
Of equal importance, it can be seriously doubted whether the father even wished to serve as a resource for the child once the mother defaulted on her promises. Tellingly, in his own testimony, the father revealed that he was not thinking at that time of serving as a caretaker for the child:
“Q. Mr. D.R.M. * * * there came a time that you found out that they were going to terminate the rights of your wife; is that correct? * * *
“A. Yes, yes, yes.
“Q. And did you understand that under the provisions of your suspended judgment that if you found that out, you had to come forward with a plan for D.R.’s future?
“A. Yes.
“Q. Okay. And did you in fact come forward with a plan for D.R.’s future * * *

“A. Yes, yes.

“Q. And what planning did you come forward with?

“A. I had my aunt in New Jersey * * *

“Q. And * * * what was the plan that you suggested to the Court when Judge Knipps was sitting as the judge?
“A. I just said that she would file a petition for custody rights so she could take him out of the system.
“Q. And what happened with that plan?
“A. Well, what happened was my aunt — she gets really sick. She had diabetes so it was kind of hard for that to happen * * * She didn’t file this petition.” (Transcript, Sept. 25, 2002, at 5-7 [emphasis added].)[10]
In sum, at best, following the mother’s failure to comply with the terms of the suspended judgment, the father made two *567 suggestions for removing the child from foster care. The first was that he care for the child. However, he failed to provide the most basic information that would permit that to occur. The second was that his aunt care for the child. She, however, never followed through. Neither of these suggestions can be considered reasonable “plans” as contemplated by the terms of the suspended judgment. Clearly, the father failed to honor those terms.
C. The Timeliness of the Petitioner’s Application
As described above, the judgment against the father was suspended from July 5, 2000 to July 5, 2001. However, the agency did not bring on its violation petition against the father until September 10, 2001. The father contends that by waiting until then, the agency permitted the suspended judgment to lapse, rendering it unenforceable, and requiring dismissal of this proceeding. We disagree.
As previously mentioned, the father relies primarily on Matter of Jonathan B. (supra). At issue there was the timeliness of a petition brought to terminate a parent’s rights for failure to comply with the terms of a suspended judgment entered upon an admission of permanent neglect. The suspended judgment had a term of eight months, expiring on January 2, 2001. The violation petition was filed nearly two months later, on February 28. The court concluded that the suspended judgment had expired in accordance with its terms and was no longer enforceable. Accordingly, it dismissed the petition.
In so holding, the court relied essentially upon two considerations. First, it noted that the controlling statute, Family Court Act § 633, limited the length of a suspended judgment to a year unless extended by court order. (193 Misc 2d at 56.) Second, it emphasized that the judgment itself failed to contain any language which could be construed as mandating a particular disposition on the date of its expiration. For example, it did not provide that the parent’s rights would automatically terminate on the expiration date. Accordingly, unless it was construed as no longer being enforceable following the date of its expiration, the judgment at issue could be read to “exist in perpetuity or until such time as the agency decides that it is convenient to file a petition alleging a violation.” (Id. at 56.) This would have the severely prejudicial effect of “depriving] both the child and the parent of perma *568 nence and certainty for it would leave open the possibility that a child care agency could seek a finding that the suspended judgment has been violated and request commitment of guardianship and custody long after the suspended judgment was entered.” (Id.) Neither of these considerations is apposite here.
Thus, Family Court Act § 633 deals with suspended judgments solely within the context of proceedings brought to terminate parental rights by reason of permanent neglect.[11] Indeed, there is no express statutory authority governing suspended judgments in the context of a proceeding — such as that at issue here — to terminate parental rights on the ground of abandonment.[12] That is not to say that application of the statutory and case law involving suspended judgments in per *569 manent neglect proceedings is irrelevant to resolution of issues in abandonment cases. There are plainly circumstances where that body of law would be applicable. (See, e.g., Matter of Lawrence Clinton S., 186 AD2d 808 [2d Dept 1992].) However, it is a fact that there is simply no absolute statutory proscription upon maintaining the initial period of a suspended judgment in abandonment cases beyond a 12-month period.
Second, while the suspended judgment at issue in Jonathan B. did not contain any language clarifying the manner in which the case was to be brought to a conclusion, quite the contrary is true here. Indeed, the enforcement procedures operated precisely as contemplated.
Thus, as discussed at the outset, the intent of the parties was that the agency pursue primary planning with the mother during the period of her suspended judgment, which was to extend 12 months from July 5, 2000 to July 5, 2001. The father, as a “backup resource,” would only step in if the mother failed. Accordingly, his suspended judgment was made temporally coextensive to the mother’s but, expressly subject to the “term and condition” that if he was served with notice of the mother’s failure to comply with the terms of her suspended judgment, then he would have “30 days to come up with a plan to remove the child from foster care.”
In other words, although his suspended judgment contained a termination date of July 5, 2001, that date was subject to operation of the 30-day provision. And, that provision could not become operative until the mother failed to comply with the terms of her suspended judgment which, by definition, was an event which might not occur until the moment before the judgment’s expiration. Put another way, the parties’ agreement contemplated that the father’s suspended judgment would expire not upon a date, but upon the happening of an event — the father’s failure to comply with the 30-day provision. Viewed in this manner, the father’s suspended judgment did not expire before the violation petition was brought.
To recap, the agency brought on its violation petition against the mother on July 5, 2001, by order to show cause which, *570 significantly, also extended the term of her suspended judgment. An affidavit of service supported petitioner’s assertion that it served the father with a copy of that violation petition promptly, on July 23. If service were in fact effected, he would have had until August 23 to come forward with a plan to remove the child to foster care. However, upon the return of the mother’s violation petition before Judge Knipps on August 27, the father apparently asserted he had not been served on July 23. (See transcript, Sept. 25, 2002, at 19-21.)[13] Accordingly, he was afforded an additional 30 days by Judge Knipps to implement the plan he proffered before her, which was to have his aunt file for custody of the child. The agency brought on its violation petition during that 30-day period, on September 10, asserting that no plan proffered by the father to that point was adequate and raising the other claims previously discussed. Under the construction of the suspended judgment that was contemplated by the parties, it had not yet expired.
Moreover, when construed in this way, the concerns voiced by the Jonathan B. court regarding the possibility of the suspended judgment remaining in limbo indefinitely are substantially addressed. That is, the time in which the agency could seek to proceed against the father was triggered by the failure of the mother to comply with her suspended judgment. And the agency commenced its proceedings against both the father and mother during the life of the mother’s suspended judgment. A stronger argument for dismissal of the father’s case might have been made had the agency waited until after the mother’s judgment had expired before proceeding against the father. Then, the question could be raised as to when, if ever, such a proceeding would have to be commenced following the mother’s default, paralleling the issue in Jonathan B. However, here the parties acted in conformity with their intent and tied the timing of the proceeding against the father to the life of the mother’s suspended judgment.
Enforcement of the terms of the suspended judgment in this manner is consistent with that line of cases which instructs the courts to ignore possible technical defects to effect the order’s purpose. For example, in both Matter of Dutchess County Dept. of Social Servs. (Collette M.) v Judy M. (227 AD2d 478, 479 [2d Dept 1996]) and Matter of David Michael J. (206 *571 AD2d 867 [4th Dept 1994]), the Appellate Division affirmed the enforcement of a suspended judgment which did not contain the warnings required by the rules of court concerning the possible consequences of a failure to comply with the suspended judgment’s terms. Both Courts found the fact that the parties had stipulated to the essential terms of the suspended judgment in open court to be controlling. For similar reasons, in Matter of Kim Shantae M. (221 AD2d 199 [1st Dept 1995]), the Court enforced a suspended judgment which had been agreed to upon the record, even though a formal written order was not entered for six months, in violation of the rules of court and Family Court Act § 217 (3):
“while the terms of the suspended judgment were not submitted to the court in a written order until June, 1993, they were still binding on respondent since the terms of the judgment were stipulated to by respondent and her counsel and agreed to in open court. Stipulations agreed to in open court are binding regardless of whether they are reduced to a written order and entered.” (221 AD2d at 199 [citations omitted]; see also Commissioner of Social Seros. [T./C. Children] v Rufelle C., 156 Misc 2d 410 [Fam Ct, Kings County 1992].)
Similarly, enforcement of the suspended judgment here is also consistent with the related principle that the parties’ intent as expressed in the order or on the record will control the instrument’s construction. (See, e.g., Matter of Josh Ray O., 267 AD2d 1048 [4th Dept 1999]; Commissioner v Rufelle C., supra.)
Here, the parties’ intent could not be plainer. Not only is it reflected in the terms of the suspended judgment itself, but it is also clear from the transcript of the proceedings in which the father admitted to abandoning his child and consented to the entry of the suspended judgment. There is no question that all parties understood that he would be given 30 days from the receipt of notice of the mother’s default to produce a plan for the child. He understood his obligations and the possible consequences of a failure to honor them. There is no bona fide issue of timeliness in this context. The father’s motion to dismiss on that basis is denied.
Conclusion
For the reasons stated, the court finds that the respondents violated the terms of the suspended judgments.

. The issue of that resource’s adequacy subsequently became moot by reason of the fact that she never filed for custody or made herself available to the agency.

. In addition to written summations, the court sua sponte asked for and received supplemental papers on the question whether a suspended judgment entered in a termination proceeding predicated upon a claim of *560 abandonment — as was the case with the father — was cognizable and enforceable under the applicable statutes. (See n 12, infra.)

. It should be noted that Ms. Busch was relying in large part on agency case records, and that the progress notes for January 2001 were missing. (See n 9, infra.) Nonetheless, even if the mother had visited four times that month, overall during the relevant period her attendance to her visitation obligations would have still been inadequate.

. Ms. Busch testified that the mother also missed another planning conference. However, there was no proof submitted to establish the mother’s knowledge that the conference had been scheduled.

. The agency even brought the children to the mother’s home on at least three occasions for visits.

. The agency also proffered evidence that the mother failed to honor her obligation under the suspended judgment to “comply with all Agency referrals.” Specifically, petitioner asserted that the mother was referred on several occasions to clinics to receive mental health services and that while she participated to some limited extent, she soon stopped attending. The mother testified that she attended a program but then had to drop out because she did not have insurance and was awaiting a referral to another program. Given the hearsay nature of the agency’s evidence concerning this issue and the lack of any corroborative documentary evidence, the court finds that the agency has not established its case in this regard.
The petitioner also sought to establish that during a visit by a caseworker to the mother’s home during the period of the suspended judgment, it was discovered the mother had suffered a black eye which the caseworker believed had been caused by an incident of domestic violence. In her testimony, the mother asserted that she obtained the black eye when she tripped over her children’s toys. Although it is plain to the court that the mother was not being truthful, the incident is irrelevant to the issues in the instant application.

. Ms. Busch testified that the child told her that “he was terrified his father was going to take him away.” (Transcript, Sept. 17, 2002, at 31.) In addition, on March 6, 2002 a psychiatric evaluation of the child recommended that the child not have any visits with his father. In fact, visits have been suspended by court order during the pendency of these proceedings.

. The father was aware of the visitation schedule which had been established by the agency, as evidenced by the fact he did attend visits on July 14, 2000, August 4, 2000, August 18, 2000, October 20, 2000 and January 22, 2001. Indeed, the father acknowledged his understanding that he was to have visits every other Friday, which is the day the dates at issue fall upon. (Transcript, Sept. 25, 2002, at 11.) Moreover, a written schedule of those dates had been mailed to respondent father.

. For example, one of the caseworkers left the agency and failed to provide progress notes for January 2001, which was within the period at issue. (Transcript, Sept. 17, 2002, at 59-60.)

. That is not to say that there were not times that the father expressed an interest in caring for the child or took steps in that direction. Indeed, on January 12, 2001, the father filed a petition seeking custody of D.R (M v R, Docket No. V01033/01 [Fam Ct, Kings County]). However, for the reasons stated in the text, when the time came for him to come forward with an *567 actual plan upon the mother’s default, he did not proffer himself in a reasonable way.

. The provision is contained within part 1 of article 6 of the Family-Court Act, entitled “Permanent termination of parental custody by reason of permanent neglect.” (See Family Ct Act § 611 [“The purpose of this part is to provide the procedures for proceedings (pursuant to Social Services Law § 384-b) for the commitment of the guardianship and custody of a child upon the ground that the child is a permanently neglected child”].)
Similarly, the applicable court rules governing suspended judgments apply only to permanent neglect cases under Family Court Act § 633 and those involving severe or repeated abuse under Social Services Law § 384-b (8) (c). (22 NYCRR 205.50.)

. It is because of the apparent absence of statutory authority for suspended judgments in abandonment cases that the court asked for additional briefing from the parties as to whether the suspended judgment at issue here was lawful and enforceable. (See Carrier!, 1994 Practice Commentaries, McKinney’s Cons Laws of NY, Book 52A, Social Services Law § 384-b, at 260 [noting the absence of authority for dispositional hearings or suspended judgments in abandonment cases, comments that “While many Judges in the Family Courts do in their discretion provide for a dispositional hearing in abandonment proceedings, any decision by the Court to return the child to a rehabilitated parent or to suspend judgment may be legally defective. The time has therefore come for the Legislature to amend Section 384-b of the Social Services Law and mandate a dispositional hearing in a proceeding to terminate parental rights based upon abandonment”].) Upon consideration, there are a number of reasons why we believe it appropriate to treat the suspended judgment at issue here as lawfully authorized.
First, both the First and Second Departments have reviewed cases involving suspended judgments in abandonment proceedings without raising any suggestion that the suspended judgments lacked legal basis. (See, e.g., Matter of Israel R., supra; Matter of Lawrence Clinton S., 186 AD2d 808 [2d Dept 1992]; see also Matter of Shannon QQ., 262 AD2d 679 [3d Dept 1999].) Indeed, in Matter of Israel R., the Court expressly approved the conduct of a dispositional hearing without express statutory authority and the entry of a suspended judgment in an abandonment proceeding.
Second, the suspended judgment was entered pursuant to an order of Judge Knipps who, in so doing, at least implicitly endorsed its legality. It *569 would be inappropriate for the undersigned, sua sponte, to effectively reverse Judge Knipps’ actions.
Moreover, all parties, represented by counsel, consented to the entry of the suspended judgment on September 6, 2000. All have assumed it lawful since that time and none has sought to set it aside. Under these circumstances, it would test the limits of sound discretion to vacate a suspended judgment without, at the very least, compelling legal or factual reasons. No such reasons have been proffered.

. The father asserts that the violation petition was served upon other family members at an address which he had recently vacated. Even if so, the father acknowledges he knew about the service, but did not take steps to read the papers until August 15. (Transcript, Sept. 25, 2001, at 21.)